Cheryl **ALFORD**, Plaintiff,

v.

State of **FLORIDA**, Office of the Auditor General, Defendant.

No. 02–23673–CIV–JORDAN.

United States District Court,
S.D. Florida,
Miami Division.

March 28, 2005.

Leslie Holland, North Miami Beach, FL, Peter Louis Sampo, Zascha Blanco, Allen Norton & Blue, Coral Gables, FL, for Plaintiff.

Oscar Edmund Marrero, Ricardo Hugo Puente, Coral Gables, FL, for Defendant.

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

JORDAN, District Judge.

On December 30, 2002, Cheryl Alford filed this suit against the State of Florida's Office of the Auditor General [D.E. 1]. The amended complaint was filed on April 9, 2003, and contains four counts [D.E. 3]. Counts 1 and 2 of the amended complaint are based on racial discrimination, and Counts 3 and 4 are based on retaliation in violation of the Civil Rights Act of 1964, as amended, 42 U.S.C.2000(e) ("Title VII") and the Florida Civil Rights Act of 1992, Chapter 760, Florida Statutes, et seq. ("FCRA"). The State now moves for summary judgment, contending: (1) that Ms. Alford has failed to establish a prima facie case of racial discrimination; (2) that she has failed to establish a prima facie case of retaliation; and (3) that even if Ms. Alford could establish a prima facie case for ei-

ther racial discrimination or retaliation, it has established legitimate non-discriminatory reasons for its actions, and that Ms. Alford has not demonstrated that the those reasons were mere pretext for retaliation or racial discrimination.

For the reasons set forth below, the State's motion for summary judgment [D.E. 22] is GRANTED.

## I. RELEVANT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one that might affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial, summary judgment is warranted. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hilburn v. Murata Elecs. North Am., Inc.*, 181 F.3d 1220, 1225 (11th Cir.1999). Thus, the task is to determine whether, considering the evidence in the light most favorable to Ms. Alford, the non-moving party, there is evidence on which a jury could reasonably find a verdict in his favor. *See Liberty Lobby*, 477 U.S. at 251, 106 S.Ct. 2505; *Hilburn*, 181 F.3d at 1225; *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

## II. RELEVANT FACTS[1]

### A. BACKGROUND

Ms. Alford is an African–American female. Beginning in 1988, she was em-

1. Under Local Rule 7.5, all material facts set forth in the statement served by the moving party are deemed admitted unless controvert- ed by the opposing party's statement. *See* Defendant's Statement of Material Facts [D.E.

ployed by the Auditor General (the "AG") for the State of Florida as a Word Processor 1. *See* Alford Depo. at 15, 18–19. The AG maintained section offices statewide, and Ms. Alford was employed in the Miami section office. *See id.* at 15. During her employment at the AG office, she held the titles of Word Processor, Office Assistant, and Executive Secretary. *See id.* at 19. Her employment at the AG office was at-will. *See* Def. Exs. 27 and 28, attached to Alford Depo. On November 6, 2001, Ms. Alford was terminated by Deputy Auditor General Michael J. Gomez for "failure to follow instructions" and "gross insubordination." *See* Def. Ex. 20, attached to Alford Depo.

From November of 1997 through November of 2001, Ms. Alford was an executive secretary supervised by Agustin Silva, the Section Audit Supervisor. *See* Silva Depo. at 8. Mr. Silva is Caucasian Hispanic. *See* Pl. Resp. to Mot. for Summary Judgment ("Pl. Resp.") at 2 [D.E. 58]; Silva Depo. at 5. Mr. Silva became responsible for all the administrative functions that related to Ms. Alford when the Miami office was split into two sections. *See* Silva Aff. at 2–4. Among other things, Mr. Silva prepared or coordinated the work schedule for Ms. Alford. *Id.* Mr. Silva could neither discipline Ms. Alford nor could he recommend such discipline or termination. *See* Silva Depo. at 44–45.

Ms. Alford also received occasional directives from Ramon "Ray" Gonzalez, the Section Audit Supervisor for the other section in Miami, who supervised Ms. Alford in Mr. Silva's absence. *See* Pl. Resp. at 2. Mr. Gonzalez is also Caucasian Hispanic. *See id.;* Gonzalez Depo. at 4. Mr. Gonzalez could only delegate tasks to the executive secretary through Mr. Silva. *See* Gonzalez Depo. at 14. Like Mr. Silva, Mr. Gonzalez could not discipline Ms. Alford, nor could he recommend that she be disciplined. *Id.*

Mr. Silva's section consisted of seven auditors and Mr. Gonzalez's section consisted of six auditors. *See* Silva Depo. at 8; Gonzalez Depo. at 8. Ms. Alford was the only employee for the Miami AG office who served as support staff. The remainder of the employees were either audit supervisors or auditors, and all were above Ms. Alford in the chain of command authority at audit sites and in the office. *See* Alford Depo. at 48. Only audit team leaders ("ATL"), however, had authority over Ms. Alford at the audit sites. *See id.* at 43.

Although Ms. Alford's duties included traveling to the audit sites like other auditors, her duties did not include rendering professional services like the other auditors. *See* Def. Ex. 1 at 4, attached to Silva Depo. Rather, her duties were to assist the audit staff with clerical work and to deliver supplies and documents. *See id.;* Pl. Resp. at 3. From 1997 to July of 2000, however, Ms. Alford performed duties only inside of the office as opposed to occasionally traveling to and from audit sites. *See* Alford Depo. at 181.

On July 5, 2000, Messrs. Silva and Gonzalez met with Ms. Alford to discuss changes to her job duties reflected in her job description. *See* Def. Ex. 1 at 2, attached to Silva Depo.; Def. Ex. 3 at 2, attached to Gonzalez Depo; Silva Aff. at 5. Subsequently, Ms. Alford submitted a memorandum to Mr. Gonzalez, in the absence of Mr. Silva, explaining her understanding of what happened at the meeting, including that the office assistant position "throughout the Auditor General's Offices was going through a change." *See* Def. Ex. 26, attached to Alford Depo. She requested that upper management confirm that "newly established out-of-office tasks were being performed by all other office assistants" because the new list had "tasks

22], and Plaintiff's Statement of Material Facts [D.E. 58 at pp. 1–5].

that fell outside of the office assistant criteria presented and accepted" by her letter of acceptance of the position. *See id.*

Jim Raulerson, Audit Manager and administrator over six section offices, including Mr. Silva's section, responded to Ms. Alford's request on July 12, 2000, with a memorandum indicating that since the appointment of Bill Monroe as the Auditor General in May of 2000, there had been many organizational changes to the AG office. *See* Def. Ex. 21, attached to Alford Depo; Mot. for Summary Judgment at 6. One of these changes was the position of office assistant. *Id.* Attached to the memorandum was a description for the position along with another document that "complemented it with specific duties and responsibilities to perform" from both Messrs. Silva and Gonzalez. *See* Def. Ex. 21, attached to Alford Depo. He wrote: "These tasks were currently being performed by other Office Assistants and are not beyond the expectations of the job. Obviously, if a task requires travel, you would be reimbursed according to existing travel policy." *Id.*

On August 1, 2000, Mr. Raulerson met with Ms. Alford and Danika Winter, Assistant General Counsel, to address Ms. Alford's concerns regarding the "working environment" in the Miami office. *See* Def. Ex. 22, attached to Alford Depo. In an August 14, 2000, memorandum to Ms. Alford, Ms. Winter summarized the August 1 meeting. *See id.* As noted in the memorandum, Ms. Alford had expressed her specific concerns about Messrs. Silva and Gonzalez—including lack of communication and management by "intimidation"—and inquired as to what her exact job expectations were. *See id.* While Ms. Alford understood that her supervisors had the right to request certain duties to be performed, she stated that "she did not want to travel to audit sites." *Id.* Mr. Raulerson explained to Ms. Alford that "travel to the audit sites was expected of all AG Office Assistants." *Id.* Ms. Alford was expected to perform travel and give assistance at the audit sites, as needed. *Id.*

Also at the meeting, Ms. Alford for the first time expressed that there was a hostile work environment based on her gender.[2] She gave examples of how she felt supervisors created a hostile environment towards other females, including raising their voices and placing a hangman's noose over Mr. Gonzalez's office. *Id.; see also* Am. Compl. ¶ 14; Alford Depo. at 64.

## B. TRAVEL BETWEEN THE AUDIT SITES AND THE OFFICE

On August 23, 2000, Ms. Alford failed to comply with Mr. Silva's request to deliver mail to the Broward County School Board audit site and bring back working papers from the audit site the next day. *See* Silva Aff. at 5–6.

A year later, on August 24, 2001, Ms. Alford failed to deliver a paper shredder, office supplies, and mail to the Miami–Dade School Board as requested. *Id.* at 6–8; *see also* Alford Depo. at 115 ("I don't know if I did or not.")

On August 26, 2001, Ms. Alford wrote a memorandum to Mr. Silva, explaining that it had been approximately a year since Messrs. Silva and Gonzalez "designated [her] as the sole pick-up/delivery person, courier, and messenger for all the items that may need to be transported between audit sites and the office ..." *See* Def. Ex. 7, attached to Alford Depo. She also stated how traveling two to three times a day, or several times a week, was becoming "physically, mentally, and emotionally stressful."

---

**2.** Gender discrimination, however is not alleged in the amended complaint. *See* Am. Compl. ¶¶ 15, 17.

*See id.* Further, she pointed out that "historically, this task was performed on a variable basis among the auditing staff as needed," and that she was "sure on some level excessive travel is incorporated into their automobile insurance policy record." *See id.* She stated her belief that her automobile insurance policy did not cover her personal vehicle or her when being utilized to provide pick-up and/or delivery, messenger and courier services, and she requested that the Auditor General provide her with a "state-owned vehicle" for her use. *See id.* She expressed her understanding that, unless she received a signed response to her memorandum prior to the next pickup, delivery, or messenger request, she was not to fulfill the request to deliver supplies. *See id.*

The following day, August 27, 2001, Mr. Silva responded to Ms. Alford's memorandum. He explained the proper reimbursement procedure in place for expenditures related to Ms. Alford's travel pursuant to Fla. Stat. § 112.061 (*i.e.,* 29 cents per mile). *See* Def. Ex. 8, attached to Alford Depo. According to the statute, any additional reimbursement for expenditures related to the operation, maintenance, and ownership of a vehicle was not allowed. *See id.*[3] In his memorandum, Mr. Silva further relayed that the General Counsel was willing to talk to Ms. Alford's insurance agent on the matter if necessary. *See* Def. Ex. 8, attached to Alford Depo. The record, however, reveals no effort by Ms. Alford to actually put her insurance agent in contact with the General Counsel. Mr. Silva again instructed Ms. Alford to immediately deliver the supplies as previously requested. *See id.*

On August 28, 2001, Mr. Silva received a letter from Ms. Alford stating: "As you know my lifting items [sic] limited. There-fore since you want me to bring the new shredder to you at the audit site, and that requires me to lift it, please e-mail me to that effect." *See* Silva Aff. at 6. According to Mr. Silva, Ms. Alford indicated she was driving a pick-up truck and that items placed on the outside truck bed would be free to move about and could get damaged. *See id.* She requested an email response authorizing the transportation of all items on the outside bed of the pick-up truck, and noted she would take no liability for any damage that might occur during the transportation process. *See id.*

As of August 30, 2001, Ms. Alford had not yet complied with Mr. Silva's instruction to deliver the supplies to the audit site. *See* Def. Ex. 9, attached to Alford Depo. On that date, Mr. Silva wrote her a memorandum addressing her concerns. *See id.* In that memorandum, Mr. Silva reminded Ms. Alford that, if she had a back disability, she must provide him or the ADA representative with written evidence and follow the procedure in § 1.17 of the AG Employee Manual. *See id.* He also told her she should not transport AG office supplies on the outside bed of her pickup truck, as they would be exposed to high wind and rain. *See id.* Mr. Silva requested Ms. Alford to transport the supplies inside the truck on the passenger side. *See id.* He again pointed out that it was her responsibility to carry sufficient insurance to perform her job responsibilities, that use of her personal vehicle for delivery of office supplies was limited and incidental, and that the General Counsel was willing to talk to her insurance agent on the matter. *See id.*

In response, Ms. Alford sent Mr. Silva an email stating that she had her own personal items in the passenger seat of her

---

**3.** In her deposition, Ms. Alford agreed that she had always been reimbursed for her travel to all the audit sites and was never denied payment for any travel made to such sites. *See* Alford Depo. at 116.

vehicle, and that she could not transport them unless he would authorize outside transport. *See* Def. Ex. 10, attached to Alford Depo.

The next day, on August 31, 2001, Mr. Gomez sent Ms. Alford a memorandum reiterating how travel was an essential requirement of her position. *See* Def. Ex. 12, attached to Alford Depo. He mentioned that while she had not "directly refused to follow Mr. Silva's instructions this week," she had instead "presented a series of reasons why she could not follow his instructions." *Id.* Mr. Gomez told her that if she did not deliver the office supplies before the close of business that day, it would constitute insubordination and result in appropriate disciplinary action. *Id.*

On September 4, 2001, Mr. Gomez sent Ms. Alford an email noting her continued failure to perform his August 31 directive. *See* Def. Ex. 13, attached to Alford Depo. He gave her until September 4, 2001 to complete the task, and warned her that failure to do so would result in a three-day suspension from work without pay. *See id.* Mr. Gomez again informed Ms. Alford that the General Counsel was willing to talk with her insurance agent on the matter if necessary. *See id.*

On September 5, 2001, John Tenewitz, the AG General Counsel, wrote a memorandum to Ms. Alford placing her on involuntarily leave without pay for three working days (Sept. 6, 7, and 10) due to her insubordination on August 24, 2001. *See* Def. Ex. 14, attached to Alford Depo.; Alford Depo. at 121.

On September 20, 2001, Mr. Silva told Ms. Alford to deliver mail and office supplies to the Miami–Dade School Board on September 24, 2001, and to assist Ms. Nadine Rodgers (the ATL at Florida International University) with moving working papers at the audit site on September 21, 2001 in connection with changing offices. *See* Silva Aff. at 8.

On September 25, 2001, Mr. Gomez issued Ms. Alford a written reprimand for gross insubordination. The memorandum also informed Ms. Alford that she was suspended for 30 days without pay (from Sept. 26 through October 25, 2001), and warned that her next act of insubordination would result in immediate termination of employment. *See* Def. Ex. 16, attached to Alford Depo.; Silva Aff. at 8, 9.

On October 31, 2001, Ms. Alford failed to comply with Mr. Silva's request to pickup a package of latex gloves and surgical masks that were delivered to the Miami–Dade Community College by mistake. *Id.* at 9; Alford Depo. at 131–132. Also on that day, Ms. Alford sent an email to Messrs. Silva, Raulerson, Gomez, Monrow, and Tenewitz, again mentioning her automobile insurance coverage as the reason she did not perform the task. *See* Def. Ex. 17, attached to Alford Depo.

On November 6, 2001, Mr. Gomez wrote a memorandum to Ms. Alford telling her to comply with the October 31 request to pick up a package of latex gloves and surgical masks by the end of the day, or she would be terminated. *See* Def. Ex. 18, attached to Alford Depo.; Silva Aff. at 9. Ms. Alford did not comply, and she was terminated on November 6, 2001. *See* Def. Ex. 20, attached to Alford Depo.

### C. OTHER ALLEGED ACTS OF INSUBORDINATION AND DISCIPLINARY ACTIONS

On August 28, 2000, Mr. Silva asked Ms. Alford to take a stack of folded cardboard boxes, which had been sitting in the lobby, to the back room storage area of the office. *See* Def. Ex. 5, attached to Alford Depo. According to Mr. Silva, Ms. Alford refused. *See* Silva Aff. at 5. On August 31, 2000, Mr. Raulerson wrote Ms. Alford a memorandum stating that when asked to move the boxes, Ms. Alford told Mr. Silva she was "not going to do it," "mentioned something about [her] back," and told Mr. Silva that

he could write her up because she "was not going to be doing this type of work." *See* Def. Ex. 5. Mr. Raulerson further instructed Ms. Alford to "follow the directions of the Miami office supervisors" and advised her that "any unwillingness to follow instructions will be considered insubordination." *See id.*

Ms. Alford has disputed that she ever said these things, and testified that she actually moved the box, though she did not say when she did so. *See* Alford Depo. at 111–113. On September 25, 2000, Mr. Gomez, the Deputy Auditor General, wrote Ms. Alford a written reprimand, stemming from the August 28 act of insubordination. *See* Def. Ex. 6; Silva Aff. at 5. Mr. Gomez further explained that during a September 19, 2000, meeting with Mr. Silva and Gonzalez, Ms. Alford again refused to store boxes. *See id.* Mr. Gomez himself had traveled to Miami on September 20, 2000, and wrote that during his meeting with her that day, Ms. Alford again indicated that she would not move the boxes "because the supervisors ... always performed this task." *See id.* He warned Ms. Alford that her failure to move the boxes immediately, or to provide details of what prevented her from accomplishing the task, would result in suspension from work without pay. *See id.*

### D. Ms. Alford's Claims of Discrimination

Commencing in early to mid-year 2000, Ms. Alford says that she began to experience racially discriminatory treatment at the AG office. *See* Alford Depo. at 19. Mr. Silva chastised Ms. Alford by making generalized statements about Blacks, such as using the phrase "you people." *Id.* at 55, 135–137. Mr. Silva also chastised Ms. Alford for not speaking Spanish, although speaking Spanish was not a requirement of her position. *Id.* at 54–55.

Mr. Silva displayed in his office what appeared to Ms. Alford to be a "shrine" which consisted of what appeared to be rotten apples, blood, bones, water and stacked pennies. *Id.* at 56. According to Ms. Alford, the shrine was displayed when only Ms. Alford, Mr. Silva, and Mr. Gonzalez were going to be in the office, and it was removed when another employee was going to report to the office. Mr. Silva displayed this "shrine" in his office anywhere between five and ten times. *Id.* at 62. Mr. Silva disputes that he displayed any such thing in his office. *See* Silva Depo. at 64. A USPS letter carrier, however, said she saw it. *See* Pl. Notice of Filing Statement of Beverly Mayfield [D.E. 62]

According to Ms. Alford, Mr. Gonzalez also displayed racial animus by displaying a hangman's noose over his office door. *See* Alford Depo. at 62, 64. To Ms. Alford, the noose symbolized "lynchings of Black people." *Id.* at 106. Mr Gonzalez did not deny that he placed the noose outside of his office, but rather states that he has "no recollection" of the matter. *See* Gonzalez Depo. at 105, 106.

In July of 2000, in an internal complaint, Ms. Alford opposed her allegedly discriminatory treatment. *See* Alford Depo. at 135.[4] In late August of 2000, after having filed the internal complaint, Ms Alford's job duties changed. *Id.* at 92.[5] Thereaf-

---

**4.** The complaint was sent to Mr. Jim Raulerson, the superior of both Mr. Silva and Mr. Gonzalez, informing him that Mr. Silva had a problem with Ms. Alford because she was black and that Mr. Gonzalez had a problem with Ms. Alford because she was a woman. *See* Alford Depo. at 135.

**5.** Ms. Alford felt that this furtherance in racially disparate treatment was in retaliation for her internal complaint to Mr. Raulerson. *See* Alford Depo. at 92.

ter, Ms. Alford was required by her superiors to travel to audit and other sites for the purpose of making deliveries.

At least some white executive secretaries in other offices of the AG throughout the state were not required to travel either at all or to the extent that Ms. Alford was required to travel. Significantly, however, these white secretaries believed such travel was within their job descriptions. *Id.* at 72, 76.[6]

On one occasion, Ms. Alford alleges that Office Depot, as part of its contract with the AG, had been engaged to deliver a paper shredder and other items to an audit site. Mr. Silva then directed Ms. Alford to cancel that delivery to the audit site and to have the items delivered to the office instead. After the items were delivered to the office, Mr. Silva directed Ms. Alford to deliver them to the audit site herself. *See* Alford Depo. at 95.

### E. Ms. Alford's Complaints of Discrimination

In July of 2000, Ms. Alford states that she filed an internal complaint opposing the discriminatory treatment she suffered, although there is no other record of such a complaint. *See* Alford Depo. at 135. Also, in a meeting with Mr. Raulerson and Ms.

Winter on August 1, 2000, Ms. Alford expressed her feeling that "Mr. Silva has a bias towards anyone who is not of Hispanic origin." *See* Def. Ex. 22 at p. 2, attached to Alford Depo.

Shortly after her termination, Ms. Alford filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations on December 12, 2001. The EEOC mailed Ms. Alford a Notice of Right to Sue on October 1, 2002. On December 31, 2002, Ms. Alford filed the present action.

### III. Analysis

### A. Counts 1 and 2—Racial Discrimination under Title VII and the FCRA [7]

In Counts 1 and 2, Ms. Alford alleges racial discrimination in violation of Title VII and the FCRA, respectively. *See* Am. Compl. at ¶¶ 17–20. Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a)(1). Based on Ms. Alford's complaint, she has alleged the dis-

---

**6.** Ms. Alford has submitted several affidavits from a group of executive secretaries from other offices of the Auditor General. *See* Affidavit of Ann Stephan at 1–2 [D.E. 63] (white female stating that she has driven locally to pick up and deliver a printer in need of repair, and that she does consider these errands to be within the purview of her Executive Secretary position); Affidavit of Janice Duggar at 1–2 [D.E. 64] (white female stating that she has never traveled to audit sites, but she would find it in the purview of her Executive Secretary position); Affidavit of Linda Carpenter at 2 [D.E. 65] (white female stating that she has traveled to audit sites and does find it the purview of her position); Affidavit of Pamela Weeks at 1–2 [D.E. 66] (white female stating that she has not traveled to audit sites to deliver or pick up office related

items, but would find this in the purview of her position, but that she has traveled to audit sites for the purpose of assisting auditors with auditing task, and she does find this in the purview of her position); Affidavit of Michelle Alarid at 1–2 [D.E. 67] (white female stating that she has never traveled to audit sites, but she would find it in the purview of her position).

**7.** Because the two counts involve the same analysis, I will address them simultaneously. *See Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir.1998) (holding that federal case law construing Title VII is persuasive authority for interpretation of the FCRA, because the FCRA mirrors and is patterned after Title VII).

parate treatment form of discrimination, as opposed to other forms (such as systematic discrimination or disparate impact). *See Texas Dep't of Commun. Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (disparate treatment occurs where "the employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin").

■■■ In disparate treatment cases, a plaintiff must prove that the defendant acted with discriminatory purpose. *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1184 (11th Cir.1984). Absent direct evidence of discriminatory purpose, however, a plaintiff can establish intentional discrimination under the three-part burden-shifting analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Commun. Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), to determine whether the evidence is sufficient to prove that intentional discrimination has occurred. *See Nix,* 738 F.2d at 1184. Under that procedure, the plaintiff must create an inference of discrimination by establishing a prima facie case. If she does so, the defendant must "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *See id.; McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. The plaintiff may then attempt to show that these reasons are pretextual or may present other evidence to show that discriminatory intent was more

likely the cause of the employer's actions. *See Nix,* 738 F.2d at 1184; *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089.

### 1. THE PRIMA FACIE CASE

■■■ A plaintiff must first establish a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally. *McDonnell Douglas,* 411 U.S. at 802–804, 93 S.Ct. 1817; *Burdine,* 450 U.S. at 252–256, 101 S.Ct. 1089; *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 505–15, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Wilson v. B/E Aero., Inc.,* 376 F.3d 1079, 1087 (11th Cir.2004). The burden of establishing a prima facie case of disparate treatment is not onerous. *See Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. Yet, to establish a prima facie case, a plaintiff must adduce evidence tending to show that the challenged adverse employment action is not readily explainable by meritorious reasons. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. Generally, a prima facie case of disparate treatment is established where the complainant shows: (1) that she belongs to a protected class; (2) that she suffered an adverse employment action; (3) that she and a similarly situated non-protected person were dissimilarly treated; and (4) that the employment action was causally related to the protected status. *See, e.g., Perkins v. School Board of Pinellas County,* 902 F.Supp. 1503, 1506–7 (M.D.Fla.1995) (citing *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976)).[8]

---

8. The State argues that the required prima facie proof includes a showing that "the plaintiff was qualified for the job from which plaintiff was dismissed." *See* Def. Mot. for Summary Judgment at 5. To include this factor, however, represents just one formulation by which a plaintiff can establish a prima facie case. Under *McDonnell Douglas,* the elements are flexible and must be tailored, on a case by case basis, to differing factual circumstances. *See* LINDEMANN, BARBARA & PAUL GROSSMAN, EMPLOYMENT DISCRIMINATION LAW at 15 (3d ed.1997) (hereinafter EMPLOYMENT DISCRIMINATION LAW); *McDonnell Douglas,* 411 U.S. at 802, n. 13, 93 S.Ct. 1817 ("The facts necessarily will vary in Title VII cases, and the specification ... of the prima facie proof required from the plaintiff is not necessarily applicable in every respect to differing factual situations."). Here the issue is not whether Ms. Alford was initially qualified for the job—as it

*See also Wilson,* 376 F.3d at 1087 ("A plaintiff establishes a prima facie case of disparate treatment by showing that she was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class. The methods of presenting a prima facie case are not fixed; they are flexible and depend to a large degree upon the employment situation.").

The parties do not dispute that Ms. Alford meets the first element. She is an African–American female, and thus a member of a protected class. *See* Def. Mot. for Summary Judgment at 5; Pl. Resp. to Mot. for Summary Judgment at 6.

It is safe to say that Ms. Alford's reprimands, suspension without pay, and ultimate termination were adverse employment actions for the purpose of her prima facie case. *See Pennington v. City of Huntsville,* 261 F.3d 1262, 1267 (11th Cir. 2001) (holding that a reprimand, if not rescinded before the employee suffers tangible harm, is an adverse employment action); *Wideman v. Wal–Mart Stores,* 141 F.3d 1453, 1455–56 (11th Cir.1998) (holding that written reprimands and one-day suspensions constituted adverse employment actions); *Wilson v. B/E Aero., Inc.,* 376 F.3d 1079, 1091 (11th Cir.2004) (holding that termination is an adverse employment action).[9] The tougher question is whether the requirement that she travel to audit cites, and to assist auditors at audit cites, may be considered adverse employment actions.

An adverse employment action is not limited to ultimate employment decisions, such as a decision to discharge an employee. *See Shannon v. Bellsouth Telecomm., Inc.,* 292 F.3d 712, 716 (11th Cir. 2002) (citing *Wideman v. Wal–Mart Stores, Inc.,* 141 F.3d 1453, 1456 (11th Cir.1998)). An employer's conduct short of an ultimate employment decision is actionable as an adverse action if it reaches a "threshold level of substantiality." *See id.* Thus, "while not everything that makes an employee unhappy is an actionable adverse action, conduct that alters an employee's compensation, terms, conditions, or privileges of employment does constitute adverse action." *See id.* (citing *Bass v. Bd. of County Comm'rs,* 256 F.3d 1095, 1118 (11th Cir.2001)). Furthermore, "the employment action must be materially adverse as viewed by a reasonable person in the circumstances," regardless of the employee's subjective view of the adversity of the employment action. *See Davis v. Town of Lake Park,* 245 F.3d 1232, 1239 (11th Cir.2001) (citation omitted). "An employment action is considered 'adverse' only if it results in some tangible, negative effect on the plaintiff's employment." *Lucas v. W.W. Grainger, Inc.,* 257 F.3d 1249, 1261 (11th Cir.2001). "[T]angible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, *reassignment with significantly different responsibilities,* or a decision causing a significant change in benefits." *Davis,* 245 F.3d at 1239 (emphasis added).

---

would be in a failure to hire scenario—but whether Ms. Alford was disciplined and terminated for non-discriminatory reasons.

9. As stated above, the question at this stage of the analysis is not whether Ms. Alford met the legitimate expectations of her employer or was qualified to perform her job—as the State

argues—but it is whether the actions were adverse. *See Holifield v. Reno,* 115 F.3d 1555, 1562 n. 3 (11th Cir.1997) (issue of whether the plaintiff was qualified to perform his job is intertwined with whether the defendant's proffered reasons for discharge were pretextual, and thus is not examined at prima facie stage).

██ For the purpose of her prima facie case—and only for that purpose—I find that Ms. Alford has demonstrated a genuine issue of material fact as to whether requirements that she make pickups and deliveries in her personal vehicle, and requirements that she assist auditors at audit sites, were adverse employment actions. It is undisputed that in mid- to late-2000, after years of working at the AG office, the terms, conditions, and duties of Ms. Alford's position as an executive secretary changed to include making pickups and deliveries in her personal vehicle, and providing certain assistance to auditors at audit sites. Viewed in the light most favorable to Ms. Alford, these changes—which apparently did not include any corresponding increase in pay—were adverse to her because the changes included significantly different responsibilities. The changes were also negative because, at the very least, she had to incur some additional unexpected wear and tear on her personal vehicle. While Ms. Alford was reimbursed for travel at a rate of 29 cents per mile, Mr. Silva did confirm that Ms. Alford could not be given any additional reimbursement for expenditures related to the operation, maintenance, and ownership of her vehicle. See Def. Ex. 8, attached to Alford Depo. For the foregoing reasons, Ms. Alford has demonstrated that she suffered adverse employment actions with regard to the requirement that she make numerous pickups and deliveries in her personal vehicle, as well as her reprimands, suspensions, and ultimate termination.

██ To show that other employees are similarly situated, a plaintiff must show that those employees are similarly situated to her in all relevant aspects. See Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316 (11th Cir.2003). In determining whether employees are similarly situated, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways. Id. The Eleventh Circuit has recognized that "disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis." Jones v. Gerwens, 874 F.2d 1534, 1541 (11th Cir. 1989). Ms. Alford contends that she is similarly situated to all other executive secretaries in AG section offices across the State of Florida, as well as all other employees in the Miami office. I disagree.

██ First, Ms. Alford does not satisfy the third element of a prima facie case with regard to other employees at the Miami AG office. She was the only executive secretary in that office. Although she and the auditors in the Miami office did share supervisors, they did not share job titles, level of education, or major responsibilities. Therefore, Ms. Alford is not similarly situated to the other employees at the Miami office.

Second, Ms. Alford does not satisfy the third element of a prima facie case with regard to other executive secretaries vis-a-vis her suspension, reprimands, and termination. Ms. Alford has not demonstrated that any of the other non-black executive secretaries were accused of insubordination or of refusing to follow directives. Since no other executive secretaries refused to follow directives or to make deliveries when requested, Ms. Alford is not able to show that she was disciplined differently for similar conduct.

Third, Ms. Alford does not satisfy the third element with regard to the requirement that she travel extensively for pickups and deliveries. Viewing the evidence in the light most favorable to Ms. Alford, all the executive secretaries had the same basic job, but the day-to-day responsibilities of executive secretaries in all of the different offices were not necessarily the same. Stated differently, Ms. Alford has

not shown that the need for executive secretary travel was the same in all of the other offices. And, as noted earlier, although some of the other executive secretaries may not have been required to perform as many deliveries as Ms. Alford did, they all viewed such deliveries as within their job descriptions. Even if Ms. Alford established the first three elements of a prima facie case, she fails to establish that the requirement for her to use her vehicle for numerous pickups and deliveries was causally related to her race. The central inquiry in evaluating whether Ms. Alford has met her initial burden is whether the circumstantial evidence is sufficient to create an inference of discrimination. *See Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir.1997). In *Holifield*, the plaintiff and others perceived that racism was present in the institution. *Id.* The Eleventh Circuit concluded that these generalizations were insufficient to establish a prima facie case of disparate treatment. *See id.*

■■■ In the present case, Ms. Alford has provided only circumstantial evidence of discrimination. For example, she relies upon Mr. Silva's comment referring to "you people" during the Elian Gonzalez controversy. *See* Alford Depo. at 135–137. Yet, Ms. Alford admitted that it was pure speculation on her part as to whether he was referring to blacks. *See* Alford Depo. at 137. Likewise, the noose hung over Mr. Gonzalez's door can only be viewed as circumstantial evidence of discrimination because there is no evidence of a connection to any employment actions taken against her. Ms. Alford never even made an "issue of it," nor did she know who the noose was directed towards. *Id.* at 62–64. Sufficient evidence is simply not present in this case. At most, the evidence, taken in the light most favorable to Ms. Alford, supports the conclusion that incidents of discrimination on the basis of race have occurred at the AG office in Miami. The evidence does not support an inference

that Ms. Alford herself was being discriminated against on the basis of her race when she was required to travel for pickups and deliveries, or when she was reprimanded, suspended, or terminated. While Ms. Alford may have felt discriminated against, her opinion, without more, is not enough to establish a prima facie case of race discrimination.

## 2. THE EMPLOYER'S BURDEN OF PRODUCING EVIDENCE

Assuming Ms. Alford can establish a prima facie case of disparate treatment—and I find that she cannot—the burden of production then shifts to the State to articulate some legitimate, nondiscriminatory reason for the adverse action in order to rebut the inference of discrimination. *See Burdine*, 450 U.S. at 253, 101 S.Ct. 1089; *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. "Because the defendant need only produce, not prove, a nondiscriminatory reason, this burden is exceedingly light." *Perryman v. Johnson Products Co.*, 698 F.2d 1138, 1142 (11th Cir.1983). In order to rebut the plaintiff's prima facie case, the defendant must "clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *See Burdine*, 450 U.S. at 255, 101 S.Ct. 1089.

■■■ I find that the State has easily met its burden of production in this case with regard to Ms. Alford's reprimands, suspensions, and termination. As cited previously, the State has produced adequate documentation verifying that Ms. Alford's numerous acts of insubordination were the reasons for the actions taken against her.

Moreover, the State has produced nondiscriminatory reasons for requiring Ms. Alford to travel to audit sites and to make pickups and deliveries in her personal vehicle. Ms. Alford does not dispute that

she was only required to start traveling in 2000, after Mr. Monroe was appointed Auditor General and began implementing organizational changes. Furthermore, Mr. Silva informed her of these changes, and of his authority to implement certain additional requirements including travel. Ms. Alford was repeatedly reminded of her new job requirements over the course of more than a year. Moreover, Ms. Alford herself submitted affidavits of several other white executive secretaries who stated that they had made pickups and deliveries in their cars, had travel to audit sites to assist auditors, and did consider these activities to be within the purview of their position [D.E. 63, 64, 65, 66, and 67]. Contrary to Ms. Alford's assertions, none of the executive secretaries ever received a state-owned vehicle or rental car to perform their duties.

The State has also produced evidence that it believed requiring Ms. Alford to use her personal vehicle was legitimate. Ms. Alford claims that her insurance agent would not provide coverage for her when using her personal vehicle for work. Ms. Alford has provided neither the affidavit of the insurance agent nor a copy of her insurance policy. The State, however, has clearly established the basis for its belief that use of her vehicle should have been covered by her insurance. *See, e.g.,* Def. Ex. 8, 9, 12, 13, and 18, attached to Alford Depo. The State has also established that it provided Ms. Alford numerous opportunities to have her insurance agent contact the General Counsel of the AG office. *See* Silva Aff. at 7. Ms. Alford has not even

suggested that she ever responded to this offer.

### 3. MS. ALFORD'S PROOF OF PRETEXT

■■■■ In the third prong of the *McDonnell Douglas* burden-shifting analysis, if the defendant successfully presents evidence of a legitimate, nondiscriminatory reason, the plaintiff still may prevail by proving that the proffered justification was a pretext for discrimination. *Id.* at 248–256, 101 S.Ct. 1089. The employer who produces evidence of a nondiscriminatory reason is entitled to summary judgment unless the plaintiff proffers evidence sufficient to create a genuine issue of material fact that discrimination was actually the reason for the challenged action. *See Kelliher v. Veneman,* 313 F.3d 1270, 1275 (11th Cir.2002). The evidence and inferences that properly can be drawn from the evidence presented during the plaintiff's prima facie case may be considered in determining whether the defendant's explanation is pretextual. *See Hicks,* 509 U.S. at 506–508, 113 S.Ct. 2742.

For the same reasons that Ms. Alford has failed to establish a prima facie case of disparate treatment, she has also failed to prove that the State's proffered nondiscriminatory reasons were pretextual. She argues that she was required to use her personal vehicle to travel to audit sites because she was black.[10] Moreover, she argues that she was reprimanded, suspended, and terminated because she was black. Yet, to support these allegations, she offers nothing more than isolated racial incidents within the office, and the fact that other white employees were

---

**10.** Significantly, Ms. Alford's claim that her insurance agent would not provide coverage for her when using her personal vehicle for work is unsubstantiated. She has provided neither the affidavit of the insurance agent nor a copy of her insurance policy. The defendant, however, has clearly established the basis for its belief that use of her vehicle

should have been covered by her insurance. *See, e.g.,* Def. Ex. 8, 9, 12, 13, and 18, attached to Alford Depo. The defendant has also established that it provided Ms. Alford numerous opportunities to have her insurance agent contact the General Counsel of the AG office. Ms. Alford has not even suggested that she ever responded to this offer.

not required to travel as much as she was. Thus, without more, and given Ms. Alford's refusal to follow the orders given to her by her superiors, these allegations are insufficient to create a genuine issue of material fact about whether the State's reasons were pretextual.[11] I am not minimizing the impropriety of any racial comments or messages by Ms. Alford's supervisors. However, Title VII is not a "general civility code," *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir.2000), and under Eleventh Circuit precedent, summary judgment must be granted in favor of the defendant, particularly since those supervisors did not have the authority to discipline or even recommend discipline of employees.

## B. COUNTS 3 AND 4—RETALIATION UNDER TITLE VII AND THE FCRA

■ In Counts 3 and 4, Ms. Alford alleges that "as a result of her complaints concerning her discriminatory treatment by her superiors, [she] was terminated from her position." *See* Am. Compl. at 4. In a retaliation case under Title VII or the FCRA, the plaintiff must show the following to establish a prima facie case: (1) a statutorily protected expression; (2) an adverse employment action; and (3) a causal link between the protected expression and the adverse action. *See Raney v. Vinson*, 120 F.3d 1192, 1196 (11th Cir.1997). Once the plaintiff has established a prima facie case of retaliation, the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action. *See*

*id.* If the defendant proffers legitimate reasons, the presumption of retaliation is rebutted and drops from the case. *See id.* At the summary judgment stage, the burden then shifts back to the plaintiff to raise a genuine factual issue as to whether the defendant's proffered reason is a pretextual ruse to mask a retaliatory action. *See id.*

### 1. PRIMA FACIE CASE OF RETALIATION

■ To satisfy the first element of a prima facie case, Ms. Alford must show that she engaged in a statutorily protected expression. In other words, she simply must show that she "has opposed any practice made an unlawful employment practice by this subchapter." *See EEOC v. White & Son Enters.*, 881 F.2d 1006, 1012 (11th Cir.1989) (citing 42 U.S.C. § 2000e–3(a)). Under the opposition clause of Title VII, it is not necessary that an employer actually engaged in an unlawful employment practice; a case of retaliation can be established if it is shown that the employee simply had "a reasonable belief that the employer was engaged in unlawful employment practices." *Id.* at 1012 n. 5. In other words, even if the employer's conduct was lawful, a plaintiff has engaged in "statutorily protected activity" when he or she opposes the employer's conduct if the plaintiff demonstrates a "good faith, reasonable belief" that the employer's conduct was unlawful. *See Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1388 (11th Cir.1998).

---

11. Even if Ms. Alford could create an issue of fact as to whether the State's reasons were untrue—which she cannot—her showing would be very weak at best, and would not prevent summary judgment against her. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evi-

dence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if ... the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.").

The State argues that Ms. Alford could not have reasonably believed the AG had engaged in unlawful employment practices, and that she therefore fails to satisfy the first prong of her prima facie case. *See* Def. Mot. for Summ. Judgment at 13–15. Viewing the facts in the light most favorable to Ms. Alford—as I must—I disagree. For the purposes of summary judgment, there is at least a genuine issue as to whether Ms. Alford believed her employer's practices were unlawful when she complained. Nevertheless, as explained below, only her complaint on August 1, 2000, satisfies the "opposition" requirement, or constitutes "statutorily protected expression," for the purpose of Title VII.

Ms. Alford alleges very generally that she opposed the discriminatory treatment against her in the form of an internal complaint in July of 2000. *See* Pl. Resp. Memo at 3. The record, however, is devoid of any evidence to support the contention that Ms. Alford complained of actual discrimination in July of 2000. Other than general references to this complaint in her deposition, Ms. Alford provides no record of a complaint pertaining to discrimination. The State, on the other hand, has produced one internal complaint by Ms. Alford. *See* Def. Ex. 26, attached to Alford Depo. This was a memorandum Ms. Alford wrote to Mr. Gonzalez on July 10, 2000, opposing the new office assistant responsibilities. *See id.* This memorandum, however, contains no allegation of racial discrimination. *See id.*

In the entire record, I can find evidence of only one other complaint by Ms. Alford in July of 2000. Mr. Raulerson stated in his affidavit that on July 31, 2000, Ms. Alford complained about supervisors making changes to time sheets. *See* Raulerson Aff. at 7. Again, however, there is no evidence that the July 31 complaint contained any allegations concerning race. Ms. Alford did testify that she filed a complaint in July of 2000 based on her feeling "that [Mr. Silva] had a problem with [her] because [she] was black," but she does not say whether she was referring to the complaint on July 10 or the one on July 31. *See* Alford Depo. at 135. She has provided no evidence that in July of 2000, she actually communicated to anyone her belief that the actions taken against her up to that point were because of race. *See* Alford Depo. at 16–18 (stating that she complained about work requirements, but stating nothing about race) and at 26–27 (stating that she complained about matters affecting her ability to put in staff time sheets, but stating nothing about race). Therefore, I find that Ms. Alford did not engage in statutorily protected expression in July of 2000.

Ms. Alford did complain about racial discrimination at a meeting on August 1, 2000. *See* Def. Reply Brief at 8; Def. Ex. 22, attached to Alford Depo. In that meeting, it is undisputed that Ms. Alford expressed to Mr. Raulerson and Ms. Winter her feeling that "Mr. Silva has a bias towards anyone who is not of Hispanic origin." *See* Def. Ex. 22 at p. 2, attached to Alford Depo. Thus, viewing the record in the light most favorable to Ms. Alford, I find that she did engage in statutorily protected expression when she opposed what she believed to be discriminatory treatment at the meeting on August 1, 2000.

I also find that Ms. Alford has satisfied the second element of a prima facie case of retaliation because it is undisputed that she suffered an adverse employment action in the form of reprimands, suspension without pay, and ultimate termination on November 6, 2001. As discussed previously, the only other employment action alleged by Ms. Alford, which creates a genuine issue of fact as to adversity, is the requirement that she travel for pickups

and deliveries, and that she assist auditors at audit sites.

■ The third element of a prima facie case of retaliation entails a causal link between the participant in the protected activity and the adverse employment decision. The Eleventh Circuit has held that "the causal link requirement under Title VII must be construed broadly, a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir.1998). *See also Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir.2001). For example, the causality prong is satisfied where the plaintiff provides sufficient evidence that the decision-maker become aware of the protected activity, and that there was close temporal proximity between when the supervisor learned of protected activity and adverse employment action. *See Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir.1999).

Here, as explained previously, Ms. Alford has demonstrated that the State was only aware of her August 1, 2000, complaint of discrimination. Ms. Alford, however, was first informed of her responsibility to travel to and from the office for pickups and deliveries as early as July 5, 2000. *See* Def. Ex. 26, attached to Alford Depo. After the complaint, on September 21, 2000, she received a formal reprimand. *See* Def. Ex. 12, attached to Alford Depo. She received another formal reprimand on September 25, 2000. *See* Def. Ex. 6, attached to Alford Depo (referring to Ms. Alford's complaint of mistreatment on September 20, 2000). Almost a year later, on September 5, 2001, she was suspended for three days without pay. *See* Def. Ex. 14, attached to Alford Depo. She received a reprimand and a 30–day suspension on September 25, 2001. *See* Def. Ex. 16, attached to Alford Depo. Finally, Ms. Al-

ford was terminated on November 6, 2001. *See* Def. Ex. 20, attached to Alfrod Depo.

■ I find that the requirement that Ms. Alford travel as part of her new job responsibilities was not causally connected to her August 1, 2000 complaint, mainly because she was first informed of this new requirement almost a month before she ever made the complaint. Moreover, her reprimands and suspensions in 2001 came over a year after she first made this complaint. Thus, I find that a genuine issue of material fact exists only as to whether her reprimands of September 21, and 25, 2000, were causally connected to her August 1, 2000, complaint of discrimination. These were the only two adverse employment actions sufficiently close in proximity to her complaint to satisfy me that they are not completely unrelated.

### 2. THE EMPLOYER'S BURDEN OF PRODUCING EVIDENCE

■ Notwithstanding that Ms. Alford has established a prima facie case of retaliation vis-a-vis her complaint in August of 2000, and her two reprimands in September of 2000, the burden now shifts to the State to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment actions. *See Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir.2000). For the reasons set forth previously, the State has shown it had legitimate, non-discriminatory reasons for imposing several reprimands and suspensions as well as for terminating Ms. Alford's employment. The State has pointed to several incidents were Ms. Alford was insubordinate, all of which have been detailed above. It is not a court's role to second guess the wisdom of an employer's decisions as long as the decisions are not racially motivated. *See A.M. Alexander v. Fulton County*, 207 F.3d 1303, 1341 (11th Cir.2000)(*en banc*).

I conclude, on this record, that the State has fulfilled its burden of showing the adverse employment actions were based on legitimate reasons and not racially motivated.

### 3. Ms. ALFORD'S PROOF OF PRETEXT

 A plaintiff bears the ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct. *See Olmsted,* 141 F.3d at 1460. Ms. Alford must prove sufficient evidence to allow a reasonable fact-finder to conclude that the proffered reasons were not actually the motivation for her discharge. *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir.1997). Ms. Alford argues that she was never required to travel to audit sites or use her vehicle to make deliveries until after she opposed the discriminatory treatment of her superiors. *See* Pl. Resp. to Motion for Summary Judgment at 8. This argument cannot stand since she was told of her possible change in job duties on July 5, 2000 and Ms. Alford's alleged "statutory protected activity" did not occur until three weeks after her notification of changes. *See* Def. Ex. 26, attached to Alford Depo.; Raulerson Aff. at 7–8. Ms. Alford also claims that, coupled with the fact that other executive secretaries did not travel to audit sites, the State intended to retaliate against her in violation of Title VII. *See* Resp. to Motion for Summary Judgment at 8. I also find this argument insufficient to establish a question of fact on pretext. All the executive secretaries expected, as part of their job, to travel to audit sites, and some had in fact have traveled to audit sites. Ms. Alford has failed to offer any evidence of discriminatory intent or motive to show that the State Auditor's explanations for its adverse employment actions were pretextual. For these reasons, Ms. Alford's retaliation claim is insufficient as a matter of law.

### IV. CONCLUSION

Because the record reveals no genuine issues of material fact related to any of the claims in Ms. Alford's complaint, the State's motion for summary judgment [D.E. 22] is GRANTED.